**SROURIAN LAW FIRM, P.C.**
Daniel Srourian, Esq.
California Bar No. 285678
3435 Wilshire Blvd., Suite 1710
Los Angeles, California 90010
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

Matthew J. Langley
California Bar No. 342846
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Tel:(312) 576-3024
Email: matt@almeidlawgroup.com

*Attorneys for Plaintiffs & the Classes*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

JOHN DOE 1 and JOHN DOE 2, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

BANYAN TREATMENT AND RECOVERY, LLC,

*Defendant*.

**Case No. 5:24-cv-01060-JGB-MRW**

1. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511(1), *et seq*.;
2. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630, *et seq*.;
3. VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIVIL CODE §§ 56, *et seq*.;

4. VIOLATION OF CAL. CONST. ART. 1 § 1;
5. INVASION OF PRIVACY - INTRUSION UPON SECLUSION;
6. BREACH OF IMPLIED CONTRACT;
7. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE SECTION 17200, *et seq.*;
8. UNJUST ENRICHMENT;
9. VIOLATION OF FLORIDA SECURITY OF COMMUNICATIONS ACT, FLA. STAT. SECTION 934.01, *et seq.*;
10. VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. SECTION 501.201, *et seq.*

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs JOHN DOE 1 and JOHN DOE 2 ("Plaintiffs") bring this class action lawsuit, on behalf of themselves and all others similarly situated, against Banyan Treatment and Recovery, LLC ("Banyan" or "Defendant"). The allegations set forth herein are based on Plaintiffs' personal knowledge, upon due investigation by their counsel and, where indicated, upon information and good faith belief. Plaintiffs believe that

substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## INTRODUCTION

1. This class action lawsuit arises out of Defendant's illegal and widespread practice of disclosing Plaintiffs' and Class Members' confidential and personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties including, but not limited to, Meta Platforms, Inc. d/b/a Facebook ("Facebook"), Google LLC ("Google") and likely other third parties, via invisible tracking codes, without Plaintiffs' knowledge or consent.

2. Defendant Banyan Treatment and Recovery LLC is "one of the fastest growing networks of detox, mental health, and addiction treatment facilities in the nation." [1]

3. As part of the medical services it provides, Banyan owns, controls, and maintains a website for its operations, https://www.banyantreatmentcenter.com/ ("Website").

4. Specifically, Defendant embedded the invisible Facebook's Meta pixel (the "Pixel" or "Meta Pixel") and Google tracking tools including Google Analytics, DoubleClick and Google Tag Manager (together with the Facebook Pixel, "Tracking Tools"), on Website, which transmit an incredible amount of personal and protected data about its Users to Facebook and Google.[2]

---

[1] *See* Banyan Treatment Centers, https://www.banyantreatmentcenter.com/.

[2] Banyan also chose to install third-party tracking codes from other big tech data brokers, including Bing and Clarity (both Microsoft), which are often used in conjunction with other trackers such as Google Analytics to gather even more data on unsuspecting website users. *See* Clarity + Google Analytics, https://clarity.microsoft.com/google-analytics.

5. Information about a person's physical and mental health—and a person's history of disorders relating to substance use in particular—is among the most confidential and sensitive information in our society, and the mishandling of medical information can have extremely serious consequences, including discrimination in the workplace or denial of insurance coverage.[3]

6. Simply put, if people do not trust that their medical information related to mental health and addiction will be kept private, they may be less likely to seek medical or substance use treatment, which can lead to more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

7. And when it comes to addiction treatment and recovery, "[c]oncerns about confidentiality frequently rank among individuals' most common reasons for not seeking substance use disorder treatment."[4]

8. Regarding the need to keep information about substance abuse and mental health private, the Department of Health and Human Services

---

[3] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world* (Nov. 16, 2022), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites* (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[4] Steve Adler, The HIPAA Journal, *Privacy Risks Identified in Websites Used to Deliver Opioid Addiction Treatment and Recovery Services* (Nov. 25, 2022), https://www.hipaajournal.com/privacy-risks-identified-in-websites-used-to-deliver-opioid-addiction-treatment-and-recovery-services/.

notes that Congress enacted the federal confidentiality law and regulations on "Confidentiality of records" relating to substance abuse more than three decades ago because it "recognized that the stigma associated with substance abuse and fear of prosecution deterred people from entering treatment."[5]

9. The federal law specifically protects the confidentiality of alcohol and drug abuse patient records, including by requiring substance abuse treatment programs to obtain patient consent for disclosures. *See* 42 U.S.C. § 290dd-2 and 42 CFR Part 2 ("Part 2").[6]

***Defendant Collects a Significant Amount of Sensitive Private Information***

10. Banyan "provide[s] nationwide addiction treatment programs and detox for a variety of substances … [and] help[s] [patients] get sober, happy, and healthy."

11. Banyan's services encompass a variety of patient programs, including medical detox from alcohol and drugs; inpatient, residential and outpatient programs; partial hospitalization; specialized substance use disorder treatments including for military and veterans, first responders, and LGBTQ patients; and "alumni programs."[7]

12. Banyan also provides a variety of mental health services,

[5] *See* The Substance Abuse and Mental Health Services Administration (SAMHSA), *Frequently Asked Questions: Applying the Substance Abuse Confidentiality Regulations to Health Information Exchange (HIE)*, https://www.samhsa.gov/sites/default/files/faqs-applying-confidentiality-regulations-to-hie.pdf.

[6] "This consent requirement is often perceived as a barrier to the electronic exchange of health information. However, as explained in the other FAQs, it is possible to electronically exchange drug and alcohol treatment information while also meeting the requirements of Part 2." *Id*.

[7] *See* https://www.banyantreatmentcenter.com/services/.

including various types of psychotherapy.[8]

13. Since 2013, Defendant's operations have grown to include "16 5-star facilities nationwide" and offers a variety of services, including medically monitored detox, intensive inpatient programs, residential addiction treatment, partial hospitalization programs, and several more.[9]

14. Defendant actively encourages patients and prospective patients to use the Website, to search available levels of care for addiction treatment including various detox programs for specific types of substance abuse; research medical conditions concerning addiction and available treatment options; verify insurance; communicate with the treatment specialists; manage medical appointments for addiction treatments; do virtual tours of Banyan's facilities; and much more.[10]

15. The Website invites patients to share and search for medical information concerning their struggles with addiction. And patients, trusting that their extremely private and sensitive information will be safeguarded, share highly intimate medical information with Banyan through its Website.

***Defendant Utilized Tracking Technologies to Monetize Users' Private Information.***

16. Plaintiffs and Class Members who visited and used Banyan's Website (collectively, the "Users") reasonably and understandably believed

---

[8] *See General Services Offered*, https://www.banyantreatmentcenter.com/general-services/.

[9] *See* https://www.banyantreatmentcenter.com/about/our-story/.

[10] The Website has changed over time; for example, in the past there was an option for patients to request their medical records online, and a "Help Yourself" section. *See* https://web.archive.org/web/20210927075726/https://www.banyantreatmentcenter.com/addiction-resources/help-yourself/; *see also* https://web.archive.org/web/20211010133612/https://www.banyantreatmentcenter.com/addiction-resources/request-medical-records/. (last visited Oct. 8, 2024).

that they were communicating only with their trusted healthcare providers.

17. At no point has Defendant, despite intentionally incorporating invisible tracking codes from unauthorized third parties into its Website and servers, informed Users that their Private Information communicated via its Website was surreptitiously collected and disclosed to a third party—let alone Facebook,[11] which has a sordid history of privacy violations.[12]

18. However, unbeknownst to Plaintiffs and Class Members, Defendant installed tracking technologies on its Website to collect and disclose their Private Information to unauthorized third parties such as Meta and Google in violation of HIPAA Privacy Rule and 42 U.S.C. § 1320d-6, Part 2 (which is much narrower in scope than the HIPAA Privacy Rule),[13] as well as state, federal and common law, for its own pecuniary gain.

19. Importantly, Part 2 permits significantly fewer uses and disclosures of patient information without consent. This federal regulation restricts the use or disclosure of any patient information that directly identifies a patient as an alcohol or drug abuser, or that links the patient to an alcohol or drug treatment program.[14]

20. Despite these clear prohibitions on the disclosure of mental

---

[11] Meta Platforms, Inc. is doing business as "Meta" and "Facebook." The terms "Meta" and "Facebook" are used interchangeably throughout.

[12] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of last year, for instance, the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html.

[13] Part 2 which, as stated above, is a federal regulation responsible for safeguarding the privacy of patient records maintained by substance use disorder treatment programs.

[14] Congressional Research Service, *Privacy Protections for Individuals with Substance Use Disorders: The Part 2 Final Rule in Brief*, at pp. 2-3 (updated June 18, 2018), https://crsreports.congress.gov/product/pdf/R/R44790/6.

health and addiction information, since at least June 2017 Defendant embedded the Meta Pixel on its Website, which transmits Users' Private Information to Facebook. The collection and transmission of this information is instantaneous, invisible and occurs without any notice to—and certainly no consent from—the Users.

21. The Meta Pixel, installed and configured by Defendant, is a piece of code that "tracks the people and [the] type of actions they take"[15] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box).[16]

22. Facebook improperly views and accesses the Private Information so that it can associate that information with the individual User whose information was disclosed and create targeted advertising that it sends to that User's personal Facebook account.

23. Meta is able to personally identify each User with an active Facebook account by using the "c_user" cookie that Meta stores in users' browsers and which reveals a Facebook account-holder's unique "FID" value. A user's FID is linked to their Facebook profile, which personally identifies the user through a wide range of demographic and other information about the user, including the user's name, pictures, personal interests, work history, relationship status, and other details. Because the user's FID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the FID to quickly and

---

[15] *Retargeting*, https://www.facebook.com/business/goals/retargeting.

[16] The pixel itself is a small snippet of code placed on webpages by the website owner. The process of adding the pixel to a webpage is a multi-step process that must be undertaken by the website owner such as Banyan.

easily locate, access, and view the user's corresponding Facebook profile.[17]

24. Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[18]

25. Google uses DoubleClick cookies such as DSID and IDE that operate similarly to the unique Facebook ID, to track users across websites and target them with ads based on their browsing activities.

26. The Meta Pixel actually collects data regardless of whether the Website visitor has a Facebook account. In fact, Facebook maintains "shadow profiles" on users without Facebook accounts and links the information collected via the Pixel to the user's real-world identity using their shadow profile.[19]

27. In addition, according to Plaintiffs' investigation, in or around 2020 Banyan configured its Meta Pixel with the "Advanced Matching" feature, which captures PII that users input into online forms.

28. Banyan's Meta Pixel was configured to capture patients' or prospective patients' email, first name, last name, phone, and state, including on the Banyan "Contact Us" form.

---

[17] To find the Facebook account associated with a particular c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

[18] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023) (order denying summary judgment and citing internal evidence from Google employees).

[19] Russell Brandom, *Shadow Profiles Are The Biggest Flaw In Facebook's Privacy Defense*, THEVERGE.COM (Apr. 11, 2018), https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy.

29. Banyan began tracking Plaintiffs and other Users from the moment they arrived on Defendant's homepage and continued to track them and disclose their User data as they navigated the Website.

30. At a minimum, Defendant disclosed Plaintiffs' and Users' sensitive medical conditions including their specific type of substance abuse disorder; highly specific treatments, types of therapy, services and programs sought from Banyan; Defendant's locations they were interested in; whether they were seeking help for themselves; whether they were checking their insurance status; their PII from online forms on the Website; the fact that they were requesting their medical records from Banyan; their Banyan "alumni" status; as well as when they attempted to call Banyan addiction facilities for immediate help.

31. By using the Meta Pixel and other tracking codes it installed on its Website, Defendant intercepted the PII and the PHI of every User that visited its every webpage, with the specific purpose of disclosing that HIPAA-protected health information to Meta, Google, and other unauthorized third parties.

32. The Meta Pixel intercepts and discloses the information of every Facebook user that visits the Defendant's Website in the same way. So, when Plaintiffs and Class Members visited Defendant's Website, the URLs that describe the medical information on each page they visited (for example: https://www.banyantreatmentcenter.com/detox-programs/opiate/, https://www.banyantreatmentcenter.com/resources/verify-insurance/ or https://www.banyantreatmentcenter.com/personal-resources/help-yourself/), or the text of buttons they clicked, were simultaneously shared with Meta during every interaction.

33. And together with that PHI, Defendant's Pixel (which relies on

Facebook cookies to function) disclosed to Meta the Facebook user ID of every person that visited its Website which allowed Meta to personally identify that User—including Plaintiffs and every Class Member who visited Defendant's Website to research and share HIPAA-protected health information with Defendant while the Pixel was installed on the Website.

34. In addition to the Tracking Tools, upon information and belief Defendant also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website servers.[20]

35. Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[21, 22] Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[23]

36. Because CAPI is located on the website owner's servers and is

---

[20] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/.

[21] https://revealbot.com/blog/facebook-conversions-api/.

[22] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api.

[23] https://www.facebook.com/business/help/2041148702652965?id=818859032317965.

not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

37. Defendant utilized the Facebook Pixel, Google tracking codes and CAPI data for marketing purposes to bolster their profits. The Tracking Tools and CAPI are routinely used to target specific customers by utilizing data and information from users' communications with the Website to build profiles for the purposes of retargeting and future marketing. Facebook and Google also use Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

***Defendant's Disclosure of Private Information Without Consent Violates the Law.***

38. Recently, in stark contrast to Defendant, several medical providers that used the Meta Pixel in a similar way have provided their patients with notices of data breaches caused by the Pixel transmitting their information to third parties.[24]

39. The Federal Trade Commission ("FTC") has taken action against at least one addiction treatment provider, fining Monument $2.5 million and banning it from disclosing its users' health data for advertising to third-party advertising platforms including Meta and Google.[25]

[24] *See, e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health Notifies Patients of Potential Data Privacy Incident*, PR NEWSWIRE (Aug. 19, 2022), https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html.

[25] *Alcohol Addiction Treatment Firm will be Banned from Disclosing Health*

40. Just like Defendant here, Monument disclosed users' personal information, including their PHI, to numerous third-party advertising platforms via tracking technologies including pixels. In its complaint against the company, the FTS alleged that these practices violated the FTC Act's prohibition against unfair and deceptive practices and the Opioid Addiction Recovery Fraud Prevention Act of 2018, which prohibits deceptive acts or practices with respect to any substance use disorder treatment service or substance use disorder treatment product.

41. Simply put, covered entities such as the Defendant are ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent from each patient. Neither Plaintiffs nor any other Class Members were provided—much less signed—a written authorization permitting Defendant to disclose their Private Information to Facebook, Google or any other third-party data brokers.

42. As recognized by both the FTC and the Office for Civil Rights ("OCR") of the Department of Health and Human Services ("HHS"), healthcare companies' use of tracking technologies to collect and divulge their patients' sensitive and confidential information is an extremely serious data security and privacy issue:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and***

---

*Data for Advertising to Settle FTC Charges that It Shared Data Without Consent* (April 11, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/04/alcohol-addiction-treatment-firm-will-be-banned-disclosing-health-data-advertising-settle-ftc.

> ***<u>advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.</u>***[26]

43. Similarly, the OCR has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "OCR Bulletin"), that the transmission of such protected information violates HIPAA's Privacy Rule:

> **Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[27]

---

[26] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[27] The OCR Bulletin, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original) (updated on June 26, 2024).

This guidance was recently vacated *in part* due to a court finding it in part to be the product of improper rulemaking and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, No. 4:23-cv-01110-P, ECF No. 67 (S.D. Tex., Jun. 20, 2024). The court's order found only that OCR's guidance regarding covered entities disclosing to third parties users' IP addresses while users navigated *unauthenticated public webpages* ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See id*. at 3-4, 31, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.").

44. The HIPAA privacy rule sets forth policies to protect all individually identifiable health information ("IIHI") that is held or transmitted, [28] and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

45. These HIPAA Identifiers, as relevant here, include names, dates related to an individual, device identifiers, web URLs, browser fingerprints, and IP addresses.[29]

46. Visits to public-facing, "unauthenticated" webpages may result in a disclosure of PHI to a tracking technology vendor like Meta if the visit is related to an individual's past, present, or future health, health care, or payment for health care:

> if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.[30]

47. The OCR bulletin reminded covered entities, like Defendant, of its long-standing duty to safeguard PHI, explicitly noting that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," and proceeding to explain how online

---

[28] The HIPAA Privacy Rule protects all electronically protected health information a covered entity like Defendant "created, received, maintained, or transmitted" in electronic form. *See* 45 C.F.R. § 160.103.

[29] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

[30] *See* OCR Bulletin, *supra*, note 27.

tracking technologies violate the same HIPAA privacy rules that have existed for decades.[31]

48. Disclosures of PHI for online marketing or sales purposes require patient authorization under HIPAA, which Defendant did not obtain here. *See* 45 CFR § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of: (A) a face-to-face communication made by a covered entity to an individual; or (B) a promotional gift of nominal value provided by the covered entity."); 45 CFR § 164.508(a)(4) ("a covered entity must obtain an authorization for any disclosure of protected health information which is a sale of protected health information, as defined in § 164.501 of this subpart [and] [s]uch authorization must state that the disclosure will result in remuneration to the covered entity.").

49. As a result, a healthcare provider like Defendant may not disclose PHI to a tracking technology vendor, like Meta or Google, unless it has properly notified its Website Users and entered into a business associate agreement with the vendor in question.

50. Despite this clear guidance, Defendant disclosed Plaintiffs' and Class Members' PHI without their consent and without a business associate agreement with Meta anyway.

51. Defendant further violated the HIPAA Privacy Rule, among other statutory and common laws, because Plaintiffs' PHI including their specific medical conditions (such as their specific diagnosis, treatment sought, and patient status) was disclosed to Meta by the Pixel and to Google by Google tracking codes embedded by Defendant on its Website.

---

[31] *Id.*

***<u>Defendant Derives Significant Value from Users' Private Information</u>***

52. There is no anonymity in the information disclosed to Facebook for marketing and analytics purposes; that is, the Pixel collects and discloses a substantial "data packet" coupled with the FID so that Defendant can, among other things, send targeted advertisements to Users based on their sensitive and protected Private Information. Defendant also uses this impermissibly obtained data for analytics purposes to gain additional insights into how its patients use its Website.[32]

53. Operating as designed and as implemented by the Defendant, the Pixel disclosed information that allows a third party (*e.g.*, Facebook) to know when and where a specific patient was seeking confidential medical care, the medical condition(s) that patients inquired about, and the precise care the patient sought or received. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers who target Plaintiffs' and Class Members' Facebook accounts based on that Private Information.

54. While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, the User's name, email address, phone number, zip code, and city of residence entered on the Website. The data packets also include the buttons a User clicks and the words a User types into a search bar.

55. For instance, when a User uses Defendant's Website where

[32] Defendant unquestionably is required to inform its Users if it deploys tracking technologies on its Website so that Users can make informed decisions as to whether they want their information to be collected, disclosed, and used in this manner. The OCR Bulletin is, again, instructive: "disclosures of PHI to tracking technology vendors for marketing purposes, ***without individuals' HIPAA-compliant authorizations,*** would constitute impermissible disclosures." *See* OCR Bulletin, *supra* note 27 (emphasis added).

tracking technologies, such as the Meta Pixel and other tracking tools are present, the Pixel transmits the contents of their communications to Facebook and Google, including, but not limited to: (i) patient's specific medical condition; (ii) substance abuse services or treatments sought, including specific types of mental therapy; (iii) patient status; (iii) fact that they are checking their insurance coverage for specific substance abuse or mental therapy services; (iv) the text of descriptive URLs visited by the User; and (v) other information that qualifies as PII and PHI under federal and state laws. The data in the "data packets" is then linked to a specific internet protocol ("IP") address, which is itself protected information under HIPAA, as well as the User's Facebook ID and other unique personal identifiers.

56. By installing the Meta Pixel and other tracking technologies, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and caused them to unknowingly disclose their private, sensitive and confidential health-related communications to Facebook and Google (and, upon information and good faith belief, other third-party data brokers).

57. The information intercepted by the Pixels and third-party tracking technologies is used to build incredibly fulsome and robust marketing profiles for individual Users and create targeted advertisements based on the medical conditions and other Private Information disclosed. Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, Banyan chose to use the Pixel data for marketing purposes to bolster its revenue.

***Defendant's Conduct Caused Concrete & Demonstrable Harm to Users.***

58. As a mental health and addiction healthcare provider, Defendant has duties and obligations to its patients and prospective patients.

59. Defendant breached those duties and obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website is safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web Users' information; (iii) failing to obtain the consent of Plaintiffs and Class Members to disclose their PII and PHI to Facebook, Google or other third parties; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' PII and PHI through the Meta Pixels, Google tracking codes and other third party trackers; (v) failing to warn Plaintiffs and Class Members about the tracking technology and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

60. Plaintiffs and Class Members have suffered injury because of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) compromise and disclosure of Private Information; (iv) diminution of value of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.[33]

61. Plaintiffs seek to remedy these harms for themselves and a class of all others similarly situated and therefore assert causes of action for (1) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*., Unauthorized Interception, Use and Disclosure; (2) Violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*; (3) Violation of the California Confidentiality of

[33] The exposed Private Information of Plaintiffs and Class Members can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting or insurance companies utilizing the information to set insurance rates. Furthermore, third parties often offer the unencrypted, unredacted Private Information for sale to criminals on the dark web for use in fraud and cyber-crimes.

Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq*.; (4) Invasion of Privacy under California Constitution; (5) Common Law Intrusion upon Seclusion; (6) Breach of Implied Contract; (7) Violation of California Unfair Competition Law § 17200, *et seq.*; (8) Unjust Enrichment; (9) Violation of Florida Security of Communications Act, Fla. Stat. Section 934.01, *et seq.*; (10) Violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Section 501.201, *et seq.*

## PARTIES

62. Plaintiff JOHN DOE 1 is a natural person and resident of the city of Roseville in Placer County, California.

63. Plaintiff JOHN DOE 2 is a natural person and resident of the city of Lantana in Palm Beach County, Florida.

64. Defendant Banyan is a Florida Limited Liability Company with its principal place of business and corporate headquarters at 950 N. Federal Hwy., Suite #115, Pompano Beach, Florida in Broward County. Banyan owns and operates a treatment facility and a telehealth program at 67580 Jones Road, Cathedral City, California in Riverside County.

65. Defendant is a covered entity under HIPAA.

## JURISDICTION & VENUE

66. This Court has "federal question" jurisdiction given the federal claim alleged by Plaintiffs. This Court also has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

67. The Court has personal jurisdiction over Defendant Banyan

because Defendant has conducted and continues to conduct substantial business in the State of California including via a Banyan treatment center and a telehealth program, and because Defendant's offending Website is available across California.

68. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' and Class Members' Private Information; Defendant collects and redistributes Class Members' Private Information in this District, and Defendant caused harm to Class Members residing in this District.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

***Plaintiff JOHN DOE 1***

69. Plaintiff JOHN DOE 1 has been a patient of Banyan's online telehealth program since early 2022 and has started using Banyan's Website around the same time.

70. Plaintiff JOHN DOE 1 is a veteran and was referred to Banyan by the U.S. Department of Veterans Affairs ("V.A.") after he sought mental health treatment from V.A.

71. Defendant encouraged Plaintiff to utilize Banyan's to search for treatments, Defendant's locations, provide his PHI including his medical history, diagnoses, treatment sought, and PII, and to make online appointments.

72. While using Defendant's Website, Plaintiff communicated sensitive—and what he expected to be confidential—personal and medical information to Defendant.

73. Plaintiff used Banyan's Website between early 2022 and February or March of 2023 for approximately one year to research particular medical concerns and treatments including but not limited to, Eye Movement Desensitization Reprocessing ("EMDR") treatments for a post-traumatic stress disorder ("PTSD"); fill out forms and questionnaires where he provided his email address and phone number to Defendant; schedule and attend at least (12) twelve online appointments over Zoom with his provider; and perform other tasks related to his specific medical diagnoses, inquiries and treatment.

74. While using Banyan's digital services, Plaintiff communicated and received information regarding his medical diagnosis, treatments, appointments, medications and clinical information. As a result of the Meta Pixel and other third-party tracker Defendant installed on its Website, this information was intercepted, viewed, analyzed and used by unauthorized third parties including Facebook and Google.

75. Plaintiff accessed Banyan's Website on his phone and laptop in connection with receiving healthcare services from Banyan or Banyan's affiliates at Banyan's direction and with Banyan's encouragement.

76. Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

77. Plaintiff started to receive unsolicited advertisements on his Facebook account relating to his medical conditions and treatments, including ads for EDMR treatments from Banyan and other healthcare providers, shortly after visiting Banyan's Website in early 2022.

78. As a medical patient using Banyan's health services, Plaintiff reasonably expected that his online communications with Banyan were

solely between himself and Banyan, and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Banyan's Privacy Policies in reasonably expecting Banyan would safeguard his Private Information. But for his status as Banyan's patient and its representations via its Privacy Policies, Plaintiff would not have disclosed his Private Information to Banyan.

***Plaintiff JOHN DOE 2***

79. Plaintiff JOHN DOE 2 has started using Banyan's Website in 2021.

80. Defendant encouraged Plaintiff to utilize Banyan's Website to search for treatments for specific medical conditions, Defendant's locations, and provide his medical diagnoses and PII.

81. While using Defendant's Website, Plaintiff communicated sensitive—and what he expected to be confidential—personal and medical information to Defendant.

82. Plaintiff used Banyan's Website between late 2021 and early 2022 to research particular medical concerns and treatments including but not limited to, treatments for an acute opioid disorder; fill out forms where he provided his email address and phone number to Defendant; and perform other tasks related to his specific medical diagnoses, inquiries and treatment.

83. While using Banyan's digital services, Plaintiff communicated and received information regarding his medical diagnosis, treatments sought, medications and clinical information, including those concerning opioid use and treatment. As a result of the Meta Pixel Defendant installed on its Website, this information was intercepted, viewed, analyzed and used by unauthorized third parties.

84. Plaintiff accessed Banyan's Website on his phone in connection

with receiving healthcare services from Banyan or Banyan's affiliates at Banyan's direction and with Banyan's encouragement.

85. Plaintiff has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

86. Plaintiff started to receive unsolicited advertisements on his Facebook account relating to his medical conditions and treatments, including ads for suboxone treatment for opioid disorder, as well as ads from Banyan and other healthcare providers, shortly after visiting Banyan's Website on several occasions in late 2021 and early 2022.

87. Further, Plaintiff began to receive phone calls from other rehab treatment centers after visiting Banyan's Website and providing his Private Information including his phone number, medical condition, and treatment sought.

88. As a medical patient using Banyan's health services, Plaintiff reasonably expected that his online communications with Banyan were solely between himself and Banyan, and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Banyan's Privacy Policies in reasonably expecting Banyan would safeguard his Private Information. But for his status as Banyan's patient and its representations via its Privacy Policies, Plaintiff would not have disclosed his Private Information to Banyan.

## <u>COMMON FACTUAL ALLEGATIONS</u>

### *A. Federal Regulators Warned Healthcare Providers that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal.*

89. Defendant's surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the

FTC and the OCR have, in recent months, reiterated the importance of and necessity for data security and privacy concerning health information.

90. The FTC published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Prenom, BetterHelp, GoodRx, and Flo Health* ***make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.***"[34]

91. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[35]

92. The federal government is taking these violations of health data

[34] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[35] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization).

privacy and security seriously, evidenced by recent high-profile FTC settlements against several telehealth companies.

93. For example, the FTC recently imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google, and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app, Premon, shared health data for advertising purposes.[36]

94. In July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns

---

[36] *See* How FTC Enforcement Actions Will Impact Telehealth Data Privacy, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google.

about the use of technologies, such as the Meta Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[37]

95. The OCR has reiterated, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule.[38]

96. The OCR Bulletin *reminds* healthcare organizations regulated under HIPAA that they may use third-party tracking tools, such as Google Analytics or Pixels *only in a limited way* to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[39]

97. The OCR Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such

[37] *See* OCR Bulletin, *supra* note 27.

[38] *Id.*

[39] *See id.*

> disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[40]

98. Moreover, investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on the digital properties of hospitals, health care providers and telehealth companies to monetize their Users' Private Information.

99. For instance, THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[41]

100. And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[42]

---

[40] *Id.* (emphasis added).

[41] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[42] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking*

101. Many healthcare sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn, or Pinterest—that collected patients' answers to medical intake questions.[43]

### *B. The Problematic Use of Invisible Meta Pixels and Other Trackers to Collect Users' Data for Advertising.*

102. Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting, for example, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

103. Here, a User's web browser executes the Pixels via instructions within each webpage of Defendant's Website to communicate certain information (within parameters set by Defendant) directly to Facebook—at the same time as the User's browser is sending this information to Defendant.

104. The Pixels can also share the Users' identifying information for easy tracking via "cookies"[44] stored on their computer by Meta or other third-party data broker with whom the User has an account. For example, Facebook stores or updates a Facebook-specific "c_user" cookie every time a person accesses their Facebook account from the same web browser.

105. The Meta Pixel can access this cookie and send certain identifying information like the User's Facebook ID to Facebook along with the other data relating to the User's Website inputs. The same is true for

---

*tools* (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies.

[43] *See id.*

[44] "Cookies are small files of information that a web server generates and sends to a web browser Cookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/.

Google and the other third-party data brokers, which also create cookies that are stored in the User's computer and accessed by the Pixels, Google Analytics and other tracking codes to identify the User.

106. The Pixels and Google trackers are programmable, meaning that Defendant controls which of the webpages on the Website contain the Pixels and which events are tracked and transmitted to Facebook and other third-party data brokers such as Google.[45]

107. Defendant used the data it collected from Plaintiffs and Class Members, without their consent, to improve its advertising and bolster their revenue.

108. Defendant installed the Meta Pixel and, upon information and good faith belief, Conversions API, as well as other tracking technologies, on many (if not all) of the webpages within their Website and programmed or permitted those webpages to surreptitiously share patients' private and protected communications with Facebook (and with other unauthorized third party data brokers via their proprietary tracking codes)—communications that included Plaintiffs' and Class Members' Private Information.

### *C. Defendant's Method of Transmitting Plaintiffs' & Class Members' Private Information via Pixels.*

109. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and

[45] Meta also provides other tracking technologies that give the same or similar tracking functionalities as Pixel, including, but not limited to, Conversions API, SDKs, and Audiences. Absent discovery, Plaintiffs are unable to independently confirm whether Defendant installed such tracking technologies on the Website. For example, Meta recommends that businesses using the Pixel also install Conversions API – a tracking tool that operates 'server-side' and allows Meta to collect more complete data about website users by evading ad or cookie blockers and other tracking restrictions across web browsers. *See* https://revealbot.com/blog/facebook-conversions-api/; *see also* https://www.facebook.com/business/help/2041148702652965?id=818859032317965; https://www.fivetran.com/blog/cookies-are-out-conversions-apis-are-in.

communications over the internet. Each "client device" (computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge browsers).

110. Every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' devices as their web browsers query the server through the internet.

111. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

1. **HTTP request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF to file a motion to a court.)

2. **Cookies**: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

3. **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

112. A patient's HTTP request essentially asks Defendant's Website to retrieve certain information (such as a set of health screening questions). The HTTP response sends the requested information in the form of

"Markup." This is the foundation for the pages, images, words, buttons and other features that appear on the participants' screens as they navigate Defendant's Website.

113. Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

114. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

115. The Pixels are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding Pixel Information Recipient, much like a traditional wiretap.

116. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Pixels).

117. Thus, Defendant is, in essence, handing its patients a tapped device and, once a webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Pixels, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Facebook.

118. Third parties like Facebook place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information

intercepted (in this case, highly sensitive Private Information).

119. Defendant intentionally configured the Meta Pixel installed on its Website to capture both the "characteristics" of individual Users' communications with its Website (their IP addresses, Facebook ID, cookie identifiers, device identifiers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to their sensitive health conditions and services sought from Defendant).

120. Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

a. Plaintiffs' and Class Members' status as rehab patients;

b. Plaintiffs' and Class Members' communications with Defendant through its Website, including medical substance abuse conditions for which they sought treatments, and treatments sought;

c. Plaintiffs' and Class Members' searches for appointments, location of treatments, medical conditions, and treatments sought;

d. Class Members' rehab program alumni status; and

e. PII, including but not limited to patients' locations, IP addresses, device identifiers, individual's unique Facebook ID and other unique personal identifiers such as email and phone number.

121. Through the Website, Defendant shares its patients' identities and online activity, including information and search results related to their private medical treatment.

122. For example, when they visit the Banyan Treatment Center Website, Banyan patients can search for several addiction treatments by selecting the "Levels of Care" menu which takes them to a list of services offered by Banyan. Patients are then directed to a variety of sensitive substance abuse treatments, including, for example Defendant's "Opiate

Detox Program." On those pages the User can access additional resources including phone numbers they can click to contact Banyan's facilities or information on opioid addiction issues.

123. The User's selections and filters are transmitted to Facebook via the Meta Pixel, even if they contain the User's treatment, procedures, medical conditions, or related queries, without alerting the User, and the communications Defendant sends to Facebook contain the User's Private Information and personal identifiers, including but not limited to their Facebook ID, IP address, datr and fr cookies, along with the search filters the User selected.

124. Here, the search parameters set by the patient and the patient's FID number are being shared together, thereby allowing Facebook to make the direct connection between the search parameters and each individual patient's FID. Even without the FID, other identifying information like IP address or device identifier is captured by the Pixel and transmitted to Facebook.

125. Every time Defendant sends a patient's Website activity data to Facebook, that patient's PII is also disclosed, including their FID. An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who knows or has acquired someone's FID. Facebook admits as much on its website. Indeed, ordinary people who come to acquire an FID can connect to the corresponding Facebook profile.

126. The screenshots of Defendant's Website below provide examples of how the Meta Pixel intercepts Users' Private Information,

including the Private Information of Plaintiffs and Class Members.

127. The first screenshot below is the web page from Defendant's Website as it appears to any User visiting this web page in search of resources for addiction treatment for themselves, ***Figure 1:***




128. The screenshots below demonstrate how the Pixel works to disclose information to Meta. Specifically, Banyan configured its Pixels to capture several kinds of "events" as Users navigated the Website, including 'PageView," 'Microdata' and 'SubscribedButtonClick.'

129. These 'events' disclosed to Facebook which pages the User was visiting and what actions they were taking on a given page, including calling the phone numbers provided for various locations and "immediate help," contacting Banyan via contact forms titled "Get help today" and "Verify your insurance information" forms.

***Figure 2**: An example of a HTTP communication session sent by the Pixel from the User's device to Facebook that reveals the User is contacting Banyan to get addiction treatment resources:*



130. On the left-hand side of the screenshot is the page as it appears to any User visiting this webpage. The right-hand side of the screenshot shows the information Defendant is disclosing to Meta through the Pixel which runs in the background, unbeknownst to the User.

131. A closer inspection of the information being conveyed makes it apparent that Defendant is disclosing the PHI that the User is sharing with Defendant when they use the Website. Not shown here (because this screenshot is from the Wayback Machine archives) is Defendant's disclosure of the User's PII in the form of the FID, which uniquely identifies an individual's Facebook account (as well as other cookies that Facebook is known to utilize to identify individuals including datr and fr cookies.

132. The highlighted portions reveal the information that Defendant is sharing with Meta. Beginning at the top, "id=369…832" is the unique ID number of the Pixel installed by Defendant. Immediately below is "PageView," a type of 'event' collected by the Pixel as the User navigates the Website which shares the URL of the page that the User is visiting.[46]

[46] A URL ("Uniform Resource Locator") is the web address that one types in the address bar at the top of the screen or which appears in the address bar

133. In the third line from the top Defendant is disclosing that the User is visiting the webpage banyantreatmentcenter/addiction-resources/help-yourself, which discloses to Meta that the User is searching for addiction treatment for themselves.

134. Further down, the highlighted value under "fbp" is the Facebook _fbp cookie, one of the ways that allows Meta to specifically associate the PHI shared in the earlier lines with a specific individual.

135. Banyan utilized the _fbp cookie, which attaches to a browser as a first-party cookie, across the Website.[47]

136. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link collected user data to unique FIDs and corresponding Facebook profiles.[48]

137. The fr cookie expires after ninety (90) days unless the User's browser logs back into Facebook.[49] If that happens, the time resets, and another ninety (90) days begins to accrue.

138. The _fbp cookie expires after ninety (90) days unless the User's browser accesses the same website.[50] If that happens, the time resets, and

---

when a person clicks on a link. When you go to use Google, the URL that appears is google.com. And when you click on Google Maps, the URL changes to google.com/maps. It is that extension to the URL, "map" that provides additional 'PageView' information that allows Pixels and other trackers to know more specifics about your internet usage.

[47] *Id*. Banyan's Pixel also utilized the "c_user" cookie which contains the unique Facebook User ID for the person visiting this webpage, the "datr" cookie which identifies the specific web browser from which the User is sending the communication, and the "fr" cookie, a unique combination of the c_user and datr cookies, to identify Users.

[48] *See id.*; *see also* Cookies *Policy*, META, https://www.facebook.com/policy/cookies/.

[49] *Id*.

[50] *Id*.

another ninety (90) days begins to accrue.

139. The Facebook Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., Defendant.[51]

140. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[52]

141. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

142. Defendant sent these unique personal identifiers to Facebook along with the Users' event data containing their PHI.

143. Additionally, at some point in 2020 Banyan enabled "Advanced Matching" parameters to capture additional unique personal identifiers, including the Users' first and last name, phone, and email.

144. Advanced Matching parameters allow the website to send personal information a user enters in a form to match them to their Facebook or Instagram profile even if they are not logged in to Facebook at the time.[53]

***Figure 3**: An example of a HTTP communication session sent by the Pixel from the User's device to Facebook that reveals the User is contacting Banyan to get addiction treatment resources for themselves, along with the User's unique personal identifiers contained in the "udff" fields*"[54]




[51] This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[52] This is confirmable by tracking network activity.

[53] The Markup, *How We Built a Meta Pixel Inspector* (April 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.

[54] Meta provides a table with the personal identifiers that can be used for matching. For example, the key "udff[em]" contains an email address as its value. *Id.*

145. Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information, nor did they authorize any assistance with intercepting their communications.

146. Plaintiffs and Class Members were never provided with any written notice that Defendant disclosed its Website Users' Private Information nor were they provided any means of opting out of such disclosures.

147. Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' and Class Members' Private Information to Facebook, including but not limited to, whether they were seeing inpatient or outpatient treatment for substance abuse, types of detox and treatment programs for their specific addictions, their military/veteran or rehab alumni status as well as their patient status at Banyan.

148. During the relevant time period, Banyan's Website had an option for patients to request their medical records. Banyan's Website's Pixel shared this information as well, including the fact that the patient clicked the "Request Medical Records" button, *Figure 5*:




149. In addition to users' search for substance abuse conditions and treatments, appointments and financial information, Defendant also disclosed sensitive information about the sexual orientation of the User.

150. For example, when a user navigates to view Defendant's "Special Programs," the user can select "LGBTQ." When the User clicks on that option, Defendant sends PageView event to Facebook revealing that the user was on the page "https://www.banyantreatmentcenter.com/unique-programs-and-therapies/addiction-for-lgbtq/." Similarly, a LGBTQ+ user seeking mental health treatment from a specific Banyan facility in Florida would have had their Private Information exposed by visiting the Website page https://www.banyantreatmentcenter.com/facilities/florida/boca-raton/mental-health/lgbtq-mental-health-treatment/.

151. Further examples of Banyan sharing patients and prospective patient's PHI include webpages for former patients, such as "unique programs and therapies" for Banyan's "alumni," *see Figure 6*:



152. At the time of filing this Complaint it appears that Defendant has removed the Meta Pixel from its Website and has re-configured its source code.

153. However, Defendant still has active third-party trackers including Google tracking codes on its Website which are still collecting and disclosing Users' Private Information to unauthorized third party data brokers, as discussed in more detail below.

154. Defendant did not seek and did not have Plaintiffs' and Class Members' consent for sharing any of the sensitive Private Information described above.

***D. Facebook's Platform & Its Business Tools***

155. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021.[55] Roughly 97% of that came from selling advertising space.[56]

156. In conjunction with its advertising business, Facebook

[55] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx.

[56] *Id.*

encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target, and market products and services to individuals.

157. Facebook's Business Tools, including the Meta Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

158. In particular, the Meta Pixel "tracks the people and type of actions they take."[57]

159. The User's web browser (software applications that allow consumers to exchange electronic communications over the Internet) executes the Pixel via instructions within the webpage to communicate certain information based on parameters selected by the website's owner.

160. The Pixel is thus customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

161. The process of adding the Pixel to webpages is a multi-step process that must be undertaken *by the website owner*.[58]

162. Facebook guides the website owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel:

> 1. Create your pixel and set up the pixel base code on your website. You can use a partner integration if one is available to you or you can manually add code to your website.

---

[57] *Retargeting*, *supra*, note 15.

[58] *Business Help Center: How to set up and install a Meta Pixel*, https://www.facebook.com/business/help/952192354843755?id=1205376682832142; *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, https://www.youtube.com/watch?v=ynTNs5FAUm8.

> 2. Set up events on your website to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your website.[59]

163. Aside from the various steps to embed and activate the Pixel, website owners, like Defendant, must also agree to Facebook's Business Tools Terms by which Facebook requires website owners using the Meta Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel and Conversions API)[60] and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."[61]

164. Once fully loaded and operational, the Pixel prompts the Users' web browser to transmit specific information based on parameters set by the website owner. This customizable nature of the Meta Pixel allows the website owner to determine which webpages contain the Pixel, which events are tracked and shared with Facebook and whether the tracked events are standard (chosen from the list of 18 provided by Facebook) or custom (defined by the website owner). For example, the Pixel can be set to capture the URLs visited by website visitors via a "PageView" event, or to capture

---

[59] *Id.*

[60] *Meta Business Tools Terms*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfbOvnb7E0sZ-wzgCW6xNLFKEOEVH_fr6JjkMINTJNqN7i1R-3MPh5caFgmdgAOxbL8&_rdr ("When you use any of the Meta Business Tools to send us or otherwise enable the collection of Business Tool Data . . ., these Business Tools Terms govern the use of that data").

[61] *Id.*; *see also* Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report* (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools").

the exact inner text of buttons clicked by a visitor, via a "SubscribedButtonClick" event.

165. The Business Tools are automatically configured to capture "Standard Events," such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[62]

166. Advertisers, such as Defendant, can track other User actions and can create their own tracking parameters by building a "custom event."[63]

167. When a user accesses a webpage that is hosting the Meta Pixel, their communications and interactions with the host webpage are instantaneously and surreptitiously sent to Facebook's servers—traveling from the user's browser to Facebook's server.

168. This simultaneous secret transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

169. In particular, Defendant tracked Users and disclosed Users'

---

[62] *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142; *see also* META PIXEL, GUIDES, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[63] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

Private Information including at least the following:

- What care and treatment options Users viewed or sought;
- When Users clicked to request an appointment or immediate help with their medical health issue;
- When Users contact Banyan to verify their insurance;
- Users' unique personal identifiers when they requested an appointment including their FID, IP address, and browser fingerprints;
- Locations where Users sought treatment;
- When Users requested their medical records from Banyan;
- Users' status as rehab program alumni; and
- When Users clicked to access and view the bill page.

170. Accordingly, during the same transmissions, the Website routinely provides Facebook with Defendant's patients' Facebook IDs, IP addresses or device IDs, and the other information they input into Defendant's Website, including their medical searches, treatment requests, and the webpages they view.

171. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[64] Plaintiffs' and Class Members' identities can be easily determined based on the Facebook ID, IP address, or reverse lookup from the collection of other identifying information that was improperly disclosed.

172. Instead of taking proactive steps to verify that businesses using the Pixel obtain the required consent, Meta uses an "honor system" under which Meta assumes these businesses have "provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."[65]

173. After intercepting and collecting this information, Facebook

---

[64] *See Guidance regarding Methods for De-identification of PHI*, *supra*, note 29.

[65] *See* Facebook Business Tools Terms, https://www.facebook.com/legal/terms/businesstools.

processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. When the Website visitor is also a Facebook user, the information collected via the Meta Pixel is associated with the User's Facebook ID that identifies their name and Facebook profile—their real-world identity.[66]

174. The Private Information disclosed via the Pixel allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought. Facebook then uses that information to sell advertising to Defendant and other advertisers or sells that information to marketers who use it to online target Plaintiffs and Class Members.

175. Facebook tracks user data and communications for its own marketing purposes and for the marketing purposes of the website owner. Ultimately, the purpose of collecting user data is to make money.

176. Thus, without any knowledge, authorization or action by a user, website owners like Defendant use source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

177. In this case, Defendant employed the Pixels, among other tracking technologies, to intercept Plaintiffs' and Class Members' Private Information to Facebook and other third party data brokers.

178. In sum, the Pixels and other tracking technologies on the Website permitted Facebook and other tracking codes' information recipients to intercept the content of Plaintiffs' and Class Members' highly

---

[66] As mentioned earlier, Facebook maintains "shadow profiles" on Users without Facebook accounts and links the information collected via the Meta Pixel to the User's real-world identity using their shadow profile. *See* https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy.

sensitive communications which contained private and confidential medical information.

179. These interceptions of Plaintiffs' and Class Members' communications content were performed without Plaintiffs' or Class Members' knowledge, consent, or express written authorization.

### *E. Google Tracking Code on Defendant's Website Collects Private Information*

180. Defendant's tracking tools have also been transmitting Users' Private Information to additional unauthorized third parties for marketing and advertising purposes, including Google.

181. Google's tracking technologies operate much like the Meta Pixel. As one District Court recently described:

> Whenever a user visits a website that is running Google Analytics, Ad Manager, or some similar Google service, Google's software directs the user's browser to send a separate communication to Google. This happens even when users are in private browsing mode, unbeknownst to website developers or the users themselves. The operation is not in dispute. When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. At the same time, the user's browser reads Google's code, which is embedded on the website. Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. This second transmission tells Google exactly what a user's browser communicated to the website.[67]

182. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate

[67] *Brown v. Google LLC*, 685 F. Supp. 3d at 920. As explained by the Court in *Brown*, Google connects user data to IP addresses; IP addresses have been classified by HHS as PII that constitutes one of the 18 HIPAA identifiers of PHI. *See* 45 C.F.R. § 164.514 (2).

and concurrent communication to Google without the user's knowledge.

183. The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

184. Like with the Meta Pixel, the User's private communications to the Website are transmitted to Google together with cookies (including Google's ga and gid cookies) and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

185. For example, if a User goes to the Website to look up addiction treatment services for themselves and verify their insurance, Google tracking tools capture that information, *Figure 7*:



186. If the User submits the form after inputting their insurance information, that action is also intercepted by Google, *Figure 8*:

seg: 1
dl: https://www.banyantreatmentcenter.com/resources/verify-insurance/
dr: https://www.banyantreatmentcenter.com/levels-of-care/intensive-inpatient/
dt: Verify Rehab Insurance Coverage | Banyan Treatment Centers
en: form_submit
ep.form_id: gform_21
ep.form_name:
ep.form_destination: https://www.banyantreatmentcenter.com/resources/verify-insurance/
epn.form_length: 29

187. Information sent to Google was sent alongside the Plaintiffs' and Class Members' unique identifier (such as "DSID" or "IDE" cookies from DoubleClick), thereby allowing individual customers' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[68]

188. Google Analytics also uses "first-party" cookies like _ga and _gid (unique to each specific website) to track users' activities on non-Google websites.

189. The __ga and _gid cookies communicate similar information to Google similarly to the way that Facebook's _fbp cookie operates.

190. Based on the above examples of how third party tracking tools operate on Defendant's Website, Meta and Google would know (1) that a particular individual—who Meta and Google could identify based on their respective accounts—was a patient or prospective patient of Defendant's seeking healthcare services for substance abuse or mental health issues, (2) that the User requested their medical records or attempted to verify their insurance, (3) that the named patient was an alumni of Banyan's, and (4)

[68] *See Brown v. Google LLC*, 2023 WL 5029899, at fn. 2, *supra*, note 16 (quoting Google employee deposition testimony explaining how Google tracks user data).

that the patient in question was attempting to contact Banyan. Meta and Google would also know the User's location and IP address, among other identifiers associated with the User's computer or cell phone. Using this Private Information, the technology companies could put the User into a Core or Custom Audience for purposes of targeted advertising by Defendant or any other company seeking to advertise its services or products to individuals that fit the named User's profile.

191. In this way, Defendant, Meta, Google, and other third parties profit off of Plaintiffs' and Class Members' Private Information without their knowledge, consent, or authorization.

### *F. Banyan's Use of the Pixels Violated Its Own Privacy Policies*

192. Defendant publishes a privacy policy that represents to patients and prospective patients visiting its Website that it will keep their PHI private and secure and that Banyan will only disclose PHI provided to it under certain circumstances, ***none of which apply here***:

> **Notice of Privacy Practices**
> This text provides information on ways in which medical data may be used and disclosed, as well as instructions on how users may gain access to their information.
> Use and Disclosure:
> **Treatment**: User's health information may be stored and reviewed by employees of Banyan Treatment Center for the purpose of evaluation, diagnosis and the delivery of treatment. User information may also be shared with outside healthcare entities for these purposes. You may receive information on your diagnosis and treatment from Banyan Treatment Center, as well as information regarding other services that may be appropriate.
> **Payment and Payment Reminders**: User information may be shared for the purpose of seeking payment from insurance companies, credit agencies, and/or banking companies. Information that may be shared includes dates of service, services provided, and diagnosis/course of treatment. Additionally, Banyan Treatment Center utilizes user information to send reminders regarding payment and schedules.
> **Company Operations**: User information may be relevant to the daily operations of Banyan Treatment Center. Examples include organizational budgeting & reporting, and quality

> assurance.
> **Law Enforcement**: User information may be released to law enforcement agencies without permission for the purposes including government audits & inspection, the support of legal investigation, and for government mandated reporting.
> Public Health Issues: Public health agencies require that certain information be shared by law. This includes the reporting of certain communicable diseases to the state public health department.
> ***Any use or release of user health information that is not detailed here requires specific authorization by the individual***.[69]

193. In fact, Banyan specifically represents that it will only share user information with third parties with user's consent or under strict security guidelines:

> **Sharing of User Information**
>
> **Banyan Treatment Center shares user information with third party organizations and/or individuals in the following circumstances only**:
> With user consent. Banyan Treatment Center requires opt-in consent by the user before any collected information is shared or distributed.
>
> For the purpose of processing information on our behalf. We share user information with our subsidiaries, affiliated organizations or third parties for this purpose. These entities are bound by an agreement to process such information according to strict guidelines, set forth by us, in compliance with the Privacy Policy as noted in this text. All processing of information must comply with other security measures that are not hereby defined.
>
> Banyan Treatment Center upholds the belief that any and all user information that is accessed, stored and/or disclosed is reasonably necessary to (a) meet the outlines of any applicable law, regulation, legal process or enforceable government request, (b) meet any designated terms of service, as well as the investigation of suspected violations of such terms, (c) for the purpose of detecting, preventing, and investigating fraud and/or security issues, (d) the diagnosis of technical issues arising on any noted sites and/or platforms, and (e ) detecting and preventing the violation of any rights to the property and/or safety of Banyan Treatment Center, its users, and the public as permitted by law.
>
> **Information Security**

[69] *See* https://www.banyantreatmentcenter.com/privacy-policy/ (emphasis added) (last visited Oct. 8, 2024).

> Banyan Treatment Center hereby agrees to take adequate measures to ensure against the unauthorized access and/or alteration to, discloser and/or destruction of user information. These measures include the internal review of all information processes and security practices set in place.
>
> Banyan Treatment Center restricts the ability of organization employees, contractors, and agents to access user information. All individuals and entities are bound by confidentiality practices, and may be subject to disciplinary action, termination and criminal prosecution if these practices are not upheld. [70]

194. With respect to tracking technologies and analytics, although Defendant admits to using these tools to collect information about browsing activity, it does not disclose to Users that it collects and discloses their PHI to third parties like Facebook.

195. For example, Defendant Policy highlights that "[i]t is required by law that Banyan Treatment Center maintain and protect the confidentiality of individual's protected health information."[71]

196. Patients and other Users of the Website are not informed about, and have not consented to, the collection of their PHI and Website activity or to providing that information to a third party.

197. This is precisely the type of information for which HIPAA requires healthcare providers to utilize de-identification techniques to protect the privacy of patients.[72]

198. Despite a lack of disclosure, Defendant allows Facebook and Google to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very information that they promise to keep private.

199. Defendant breached its own privacy policies by unlawfully

---

[70] *Id.*

[71] *Id.*

[72] *See Guidance regarding Methods for De-identification of PHI*, *supra,* note 29.

permitting Facebook, Google and likely other third parties to intercept Users' Private Information without obtaining patients' consent or authorization. Facebook and Google then read, understood, and used that Private Information for their own business purposes—i.e., selling targeted advertising to Defendant (and other companies) which specifically targeted those Users based on their reproductive health conditions.

### *G. Defendant Violated HIPAA and Part 2.*

200. Defendant's disclosure of Plaintiffs' and Class Members' Private Information to entities like Facebook and Google also violated federal regulations concerning patient PHI, such as HIPAA and Part 2.

201. Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[73]

202. Guidance from HHS instructs healthcare providers that patient status alone is protected by HIPAA.

203. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

204. The Privacy Rule broadly defines PHI as IIHI that is

[73] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

"transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

205. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
. . .
H. Medical record numbers;
. . .
J. Account numbers;
. . .
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[74]

206. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

207. Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI.

[74] *See* 45 C.F.R. § 160.514.

208. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[75]

209. Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[76]

210. Here, as described *supra*, Defendant provided patient information to third parties like Facebook in violation of the Privacy Rule—and its own Privacy Policy.

211. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."

212. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained

---

[75] *See Guidance regarding Methods for De-identification of PHI*, *supra*, note 29.

[76] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Oct. 8, 2024).

or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

213. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains IIHI relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

214. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306I, and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Defendant failed to do.

215. Under HIPAA, Defendant may not disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. See HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

216. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section

164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. section 164.306(a)(3); and

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

217. As mentioned earlier, the federal law that specifically protects the confidentiality of alcohol and drug abuse patient records is even narrower than HIPAA Privacy Rule and permits significantly fewer uses and disclosures of patient information without consent. *See* 42 U.S.C. § 290dd-2 and 42 CFR Part 2.

218. This federal regulation restricts the use or disclosure of any patient information that directly identifies a patient as an alcohol or drug abuser, or that links the patient to an alcohol or drug treatment program. Under Part 2, patient-identifying information may not be disclosed without a patient's written consent except pursuant to certain specified conditions in the following circumstances: (1) medical emergencies, (2) research, (3) program audits and evaluations, and (4) pursuant to a court order authorizing disclosure.[77]

219. In disclosing the content of Plaintiffs' and Class Members'

[77] *Privacy Protections for Individuals with Substance Use Disorders: The Part 2 Final Rule in Brief*, *supra*, note 14.

communications, Defendant had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions, that is, to illegally disclose Plaintiffs' and Class Members' Private Information to Facebook and Google in violation of HIPAA, including 42 U.S.C. § 1320d-6(a)(3), as well as the torts alleged below.

220. Banyan intercepted the content of Plaintiffs' and Class Members' communications, including their Private Information, for a criminal and tortious purpose. Defendant would not have been able to obtain the Private Information or the marketing services it did if it had complied with the law.

221. Commenting on a June 2022 report discussing the use of Meta Pixels by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[78]

222. Banyan's placing of third-party tracking codes on its Website is a violation of Plaintiffs' and Class Members' privacy rights under federal and state law. While Plaintiffs do not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

***H. Banyan Violated Industry Standards.***

223. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship—it is a cardinal rule.

224. The American Medical Association's ("AMA") Code of

---

[78] ADVISORY BOARD, '*Deeply Troubled*': *Security experts worry about Facebook trackers on hospital sites*, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

225. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.][79]

226. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.[80]

227. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping with ethics guidelines for confidentiality.[81]

228. Defendant's use of the Pixels and Google trackers also violates FTC data security guidelines. The FTC has promulgated numerous guides

---

[79] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf.

[80] *Id.*

[81] *Id.*

for businesses, which highlight the importance of implementing reasonable data security practices.

229. The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[82] established cyber-security guidelines for businesses. These guidelines state that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network vulnerabilities, and implement policies to correct any security problems.

230. As described earlier, the FTC has recently brought enforcement actions against several healthcare companies for conveying information—or enabling an inference—about their consumers' health to unauthorized third parties without the consumers' consent.

231. Like the health care companies fined by the FTC in recent years, including the addiction treatment provider Monument, Defendant failed to implement these basic, industry-wide data security practices.

***I. Users' Reasonable Expectation of Privacy.***

232. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

233. Indeed, when Plaintiffs and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share their Private Information with third parties for a commercial purpose unrelated to patient care.

234. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before

---

[82] *See* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

a company collects and shares its customers' data to be one of the most important privacy rights.

235. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[83]

236. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

237. Plaintiffs' and Class Members' reasonable expectations of privacy in their PHI are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of patients' PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

### *J. Unique Personal Identifiers are PHI.*

238. While not all health data is covered under HIPAA, the law specifically applies to healthcare providers, health insurance providers, and healthcare data clearinghouses.[84]

---

[83] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

[84] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook* (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you

239. The 18 HIPAA Identifiers that are considered PII, as relevant here, include dates related to an individual, device identifiers, web URLs and IP addresses.[85]

240. Defendant improperly disclosed Plaintiffs' and Class Members' HIPAA identifiers, including device and other unique personal identifiers, unique Facebook and Google identifiers, computer IP addresses, and web URLs visited to Facebook through their use of the Pixel *in addition to* services selected, patient statuses, medical conditions and treatments.

241. An IP address is a number that identifies the address of a device connected to the Internet. IP addresses are used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

242. Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

243. Facebook, Google, and other third-party marketing companies track IP addresses to target individual homes and their occupants with advertising.

244. Under HIPAA, an IP address is considered PII, which is defined as including "any unique identifying number, characteristic or code," specifically listing IP addresses among examples. See 45 C.F.R. § 164.514 (2).

---

are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations").

[85] *See Guidance regarding Methods for De-identification of PHI*, *supra*, note 29.

245. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

246. Consequently, Defendant's disclosure of Plaintiffs' and Class Members' IP addresses (and other unique personal identifiers) violated HIPAA and industry-wide privacy standards.

### ***K. Defendant was Enriched by & Benefitted from the Use of the Pixel & Other Tracking Technologies.***

247. Defendant decided to embed the Pixel and other tracking technologies on its Website with the purpose of disclosing Plaintiffs' and Class Members's communications to Facebook, Google and other unauthorized third parties in order to improve marketing by creating campaigns that maximize conversions and thereby decrease costs to Defendant and boost its revenue.

248. After receiving individually identifiable patient health information communicated on Defendant's Website, Facebook analyzes this data, improves its own technology and business (including machine learning), and then forwards this data and analysis of this data, to Defendant.

249. Defendant then used this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

250. Facebook, as well, uses this data and analysis for its own commercial purposes, including to improve its platform and better understand the individuals that make up the audiences that its clients (advertisers) pay Facebook to target with ads.

251. Defendant also receives an additional commercial benefit from

using third party tracking tools, such as the Meta Pixel, in being able to serve more targeted advertisements to existing and prospective patients on their Meta accounts such as Facebook and Instagram.

252. Facebook advertises its Pixel as a piece of code "that can help you better understand the ***effectiveness of your advertising*** and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting."[86]

253. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[87]

254. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking technologies and the Pixel embedded on, in this case, Defendant's Website.

255. For example, when a User searches for sensitive substance abuse conditions or treatment on Banyan Treatment Center's Website, that information is sent to Facebook. Facebook can then use this data on the User to find more users to click on a Banyan ad and ensure that the targeted Users are more likely to convert.[88]

---

[86] *What is the Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel (emphasis added).

[87] *The complex world of healthcare retargeting,* https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/.

[88] *See, e.g.*, *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking.

256. Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[89]

257. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

258. In exchange for disclosing the Private Information of their account holders and patients, Defendant is compensated by Facebook and Google (and other third-party data brokers) in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

259. But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[90]

260. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[91]

---

[89] *Id.*

[90] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant).

[91] *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion*

261. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[92]

262. Whether a user has a Facebook profile is not indicative of damages because Facebook creates shadow profiles, and at least one court has recognized that the pixels' ability to track comprehensive browsing history is also relevant. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078–79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from websites and Google Cookies that it collects across the internet on the same user).

263. Upon information and good faith belief, Defendant retargeted patients and potential patients, including Plaintiffs and Class Members.

264. Thus, utilizing the Pixels directly benefits Defendant by, among other things, reducing the cost of advertising and retargeting.

### *L. Plaintiffs' Private Information is Extremely Valuable.*

265. Plaintiffs' and Class Members' Private Information has value, and Defendant's disclosure and interception harmed Plaintiffs and the Class by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

266. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

---

*Tracking*, *supra*, note 88.

[92] *The complex world of healthcare retargeting, supra*, note 87.

267. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

268. The robust market for Internet user data has been analogized to the "oil" of the tech industry.[93] A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge."[94] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

269. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).95 That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

270. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[96]

271. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the

---

[93] *See* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[94] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[95] *See What Your Data is Really Worth to Facebook* (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.

[96] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[97]

272. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

273. Courts recognize the value of personal information and the harm when it is disclosed without consent.[98]

274. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

275. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

276. The value of health data is well-known and various reports have been conducted to identify its value.

277. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in

---

[97] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/.

[98] *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that plaintiffs' allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[99]

278. Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[100]

279. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[101]

280. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[102]

281. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence

---

[99] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

[100] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

[101] *See* https://time.com/4588104/medical-data-industry/.

[102] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

of the value of PHI.

282. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

283. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

284. Defendant shared Plaintiffs' and Class Members' communications and transactions on its Website without permission.

285. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website's Users, including Plaintiffs and Class Members.

286. Plaintiffs have a continuing interest in ensuring that their future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## TOLLING

287. Any applicable statute of limitations has been tolled by the "delayed discovery" rule.

288. Plaintiffs did not know (and had no way of knowing) that their Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret. Plaintiffs only discovered that their Private Information had been disclosed by Defendant, at the earliest, in January 2024 when they first discussed their potential claims with undersigned counsel.

## CLASS ACTION ALLEGATIONS

289. **<u>Class Definition</u>:** Plaintiffs bring this action on behalf of themselves and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

290. The **Nationwide Class** that Plaintiffs seek to represent is defined as:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Website.

291. The California Subclass that Plaintiff JOHN DOE 1 seeks to represent is defined as:

> All individuals residing in California whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Website.

292. The Florida Subclass that Plaintiff JOHN DOE 2 seeks to represent is defined as:

> All individuals residing in Florida whose Private Information was disclosed to a third party without authorization or consent through the third-party tracking technologies on Defendant's Website.

293. Plaintiffs reserve the right to modify the class definition or add Subclasses as necessary prior to filing a motion for class certification.

294. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

295. The Nationwide Class, California Subclass, and Florida Subclass are referred to collectively as the "Classes." Excluded from the

Class is the Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant have a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

296. **Numerosity/Ascertainability.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time. However, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

297. **Typicality.** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used the Website and had their PII and/or PHI disclosed to Facebook without her express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

298. **Adequacy.** Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class.

299. **Common Questions of Law and Fact Predominate/Well-Defined Community of Interest.** Questions of law and fact common to the Class predominate over questions that may affect only individual Class

Members because Banyan has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

a. Whether and to what extent Banyan had a duty to protect Plaintiffs' and Class Members' Private Information;

b. Whether Banyan had duties not to disclose Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c. Whether Banyan violated its privacy policies by disclosing Plaintiffs' and Class Members' Private Information to Facebook, Google or other third parties;

d. Whether Banyan adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private

Information;

h. Whether Defendant violated the consumer protection statutes invoked herein;

i. Whether Defendant knowingly made false representations or omitted material representations as to its data security or privacy policy practices;

j. Whether Defendant knowingly omitted material representations with respect to its data security or privacy policy practices;

k. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

l. Whether Plaintiffs and Class Members are entitled to actual, consequential or nominal damages as a result of Defendant's wrongful conduct;

m. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information;

n. Whether Plaintiffs and Class Members are entitled to damages under CIPA, the CMIA, or any other relevant statute; and

o. Whether Defendant's actions violate Plaintiffs' and Class Members' privacy rights as provided by the California Constitution.

300. **Superiority.** Class action treatment is a superior method for the

fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(1), *et seq.*
### (*On behalf of Plaintiffs & the Nationwide Class*)

301. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themselves and the proposed Class.

302. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

303. The ECPA protects both sending and receipt of communications.

304. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

305. The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

306. **Electronic Communications.** The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

307. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] ***any information concerning the substance, purport, or meaning of that communication***." 18 U.S.C. § 2510(8) (emphasis added).

308. The intercepted communications include:

a. Parties to the communications;

b. PII such as patients' IP addresses, Facebook IDs, browser fingerprints and other unique identifiers;

c. upon information and belief, the content of Plaintiffs' and the Class members' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, symptoms, insurance, and payment information; and

d. Full-string URLs that contain any information concerning the substance, purport, or meaning of patient communications with their health entities.

309. **Interception.** The ECPA defines an interception as the

"acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

310. **Electronical, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

311. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and Meta use to track Plaintiffs' and the Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices;

d. Defendant's web-servers and

e. The Pixels deployed by Defendant to effectuate sending and acquiring Users' and patients' sensitive communications.

312. Plaintiffs and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

313. By utilizing and embedding the Pixel, Google trackers, and other third party trackers on its Website, Defendant intentionally intercepted, endeavored to intercept, or procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

314. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Meta Pixel, Conversions API,

Google trackers, and other tracking technologies, which tracked, stored and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Facebook and Google.

315. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class Members regarding PII and PHI, including their unique Facebook ID, unique Google user IDs, IP address, their medical condition, treatment information, and patient status. This information was, in turn, used by third parties, such as Facebook, to 1) place Plaintiffs in specific health-related categories and 2) target Plaintiffs with particular advertising associated with Plaintiffs' specific and highly sensitive health conditions. Defendant knowingly transmitted this data and did so for the purpose of financial gain.

316. By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to Facebook, Google and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

317. By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

318. <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of California and Florida—

namely, HIPAA, Part 2, and invasion of privacy, among others.

319. Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual*, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[103]

320. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiffs' expectations of privacy, and constitutes tortious or criminal conduct through a violation of 42 U.S.C. § 1320d(6).

321. Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels and Google tracking codes to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

322. Defendant was not acting under color of law to intercept Plaintiffs' and the Class Members' wire or electronic communication.

[103] *Id.* § 1320d-(6) (emphasis added).

323. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Pixel and Google tracking codes. Plaintiffs and absent class members (all of whom are patients) had a reasonable expectation that Defendant would not re-direct their communications content to Facebook, Google or others attached to their personal identifiers in the absence of their knowledge or consent.

324. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

325. In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, researching medical conditions and treatment, checking their insurance coverage, requesting medical records, and contacting Banyan to receive treatment for highly sensitive medical conditions, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions including a knowing intrusion into a private place or matter that would be highly offensive to a reasonable person.

326. Consumers have the right to rely upon the promises that companies make to them. Banyan accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause Meta Pixels and cookies (including but not limited to the _fbp, _ga and _gid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class members' computing devices as "first party" cookies that are not blocked.

327. Defendant's scheme or artifice to defraud in this action consists of:

a. the false and misleading statements and omissions in its privacy policies set forth above, including the statements and omissions recited

in the claims below;

b. the placement of the '_fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta;

c. the placement of the '_ga' and '_gid' cookies on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Google.

328. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property:

a. property rights to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect or use such information for marketing purposes; and

b. property rights to determine who has access to their computing devices.

329. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property:

a. with knowledge that (1) Defendant did not have the right to share such data without written authorization; (2) courts had determined that a healthcare providers' use of the Meta Pixel and other third party tracking codes gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable Facebook user would not understand that Meta was collecting their Private Information based on their activities on Defendant's Websites; (4) "a reasonable Facebook user would be shocked to realize" the extent of Meta's collection of Private Information; (5) a Covered Incident had occurred which required a report to be made to the FTC pursuant to Meta's consent decrees with the FTC and (6) the subsequent use of health information for advertising was a further invasion of such property rights in making their own exclusive use of their Private Information for any purpose not related to the provision of their healthcare; and

b. with the intent to (1) acquire Plaintiffs and Class Members' Private Information without their authorization and without their healthcare

> providers or covered entities obtaining the right to share such information; (2) use Plaintiffs' and Class Members' Private Information without their authorization and (3) gain access to Plaintiffs' and Class Members' personal computing devices through the '_fbp,' '_ga' and '_gid' cookies disguised as a first-party cookies.

330. A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

331. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiffs and Class Members were damaged by Defendant's conduct.

332. For the same reasons as set forth below for Plaintiffs' CIPA Claims, Defendant is liable to Plaintiffs and Class Members for violations of the ECPA.

333. Based on the foregoing, Plaintiffs and Nationwide Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT II

## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT

**Cal. Penal Code §§ 630, *et seq.***

**(*On behalf of Plaintiff JOHN DOE 1 & the California Subclass*)**

334. Plaintiff JOHN DOE 1, on behalf of himself and the California Subclass, repeats the allegations contained in the paragraphs above as if fully set forth herein.

335. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

336. CIPA begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

CAL. PENAL CODE § 630.

> California Penal Code § 631(a) provides, in pertinent part:
> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

337. A defendant must show it had the consent of *all* parties to a communication.

338. At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook, Google and other third parties to track and intercept Plaintiff's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Pixel to permit Facebook and Google to eavesdrop on and intercept in real-time the content of Plaintiff's and California Subclass Members' private communications with Defendant.

339. The content of those conversations included Private Information, such as highly sensitive PHI. Through Banyan's installation and configuration of the Pixels and Google tracking codes on its Website, these communications were intercepted by Facebook during the

communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

340. Banyan intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and California Subclass Members, transmitted the substance of their confidential communications with Defendant to a third party.

341. Defendant willingly facilitated Facebook's, Google's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private medical information by embedding the Pixel(s) on the Website, thereby assisting Facebook's eavesdropping.

342. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Facebook, Google and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;
b. Plaintiff's and California Subclass Members' browsers;
c. Plaintiff's and California Subclass Members' computing and mobile devices;
d. Facebook's web and ad servers;
e. Google's web and ad servers;
f. The web and ad servers from which Facebook, Google and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;
g. The computer codes and programs used by Facebook, Google and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the Website; and
h. The plan Facebook, Google and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

343. Defendant failed to disclose that it uses the Pixels and Google trackers to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are confidential as its Website Privacy Notices acknowledge the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

344. The patient communication information that Defendant transmits while using the Pixel and Google tracking technologies constitutes PHI.

345. As demonstrated hereinabove, Banyan violates CIPA by aiding and permitting third parties, including Facebook and Google and their agents, employees, and contractors to receive its patients' online communications in real time through its Website without their consent. Facebook specifically receives the content of these communications and understands it, as the FID is assigned by Facebook and Facebook must understand the content in order to process it and link it to individual Users so that Facebook may target advertising to those persons based on their healthcare choices. Google uses unique user IDs to accomplish same.

346. By disclosing Plaintiff JOHN DOE 1 and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

347. As a result of the above violations and pursuant to CIPA Section 637.2, Banyan is liable to Plaintiff and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of

$5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

348. Under the statute, Banyan is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**

**VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**Cal. Civ. Code §§ 56, *et seq.***
**(*On behalf of Plaintiff JOHN DOE 1 & the California Subclass*)**

317. Plaintiff JOHN DOE 1, on behalf of himself and the California Subclass, repeats the allegations contained in the paragraphs above as if fully set forth herein.

318. The California Confidentiality of Medical Information Act, California Civil Code §§ 56, *et seq.* ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" CAL. CIV. CODE § 56.05.

319. Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

320. Plaintiff and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with

the CMIA's requirements. As set forth above, unique user IDs, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff and California Subclass Members are transmitted from within the State of California to Defendant in combination with patient medical conditions, medical concerns, and treatment(s) sought by the patients. This is PHI under the CMIA.

321. This private medical information is intercepted and transmitted within the State of California to third parties including Facebook and Google and their agents, employees, and contactors via Defendant's knowing and intentional decision to embed enabling software into its Website.

322. Facebook ID and Google user IDs are also identifiers sufficient to allow identification of an individual. Along with patients' user IDs, Defendant discloses to third parties including Facebook, Google and their agents, employees, and contactors several pieces of information regarding patient use of its Website including but not limited to the following: patient medical conditions, medical concerns, and treatment(s) sought by the patients.

323. The information described above constitutes medical information pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and this medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05(i).

324. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in its Website Privacy Notice that it shares PHI with Facebook, Google or other third parties for marketing purposes.

325. Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or his representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Notice does not qualify as a valid authorization.

326. As described above, Banyan is violating the CMIA by disclosing its patients' medical information to third parties, including Facebook and Google, along with the patients' individually identifying information. Accordingly, Plaintiffs and California Subclass Members seek all relief available for Defendant's CMIA violations.

327. Plaintiff JOHN DOE 1 and Class Members seek nominal damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

## COUNT IV

## INVASION OF PRIVACY—CALIFORNIA CONSTITUION ART. 1 § 1

**(*On behalf of Plaintiff JOHN DOE 1 & the California Subclass*)**

328. Plaintiff JOHN DOE 1 repeats the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themselves and the proposed California Subclass.

329. Plaintiff JOHN DOE 1 and California Subclass Members have an interest in: (1) precluding the dissemination and misuse of their sensitive, confidential communications and PHI; and (2) making personal decisions or conducting personal activities without observation, intrusion or interference,

including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and California Subclass Members' knowledge or consent.

330. At all relevant times, by using Facebook's, Google's and other third parties' tracking pixel(s) to record and communicate patients' unique user IDs and other individually identifying information alongside their confidential medical communications, Banyan intentionally invaded Plaintiff's and California Subclass Members' privacy rights under the California Constitution.

331. Plaintiff and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install wiretaps on its Website to secretly transmit communications to a third party.

332. Plaintiff and California Subclass Members did not authorize Defendant to record and transmit Plaintiff's and California Subclass Members' private medical communications alongside their personally identifiable health information.

333. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right.

334. The unauthorized disclosure and acquisition by a third party of Plaintiffs' and Class Members' PII and PHI is highly offensive to a reasonable person.

335. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' PII and PHI constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as

to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

336. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant secretly planted computer code onto its Website which directed Plaintiffs' private, federally protected IIHI, to be sent to Facebook, Google and other third parties.

337. By sending Plaintiffs' PHI and IIHI to Facebook and Google, these third parties enriched Defendant with valuable data analytics and the ability to target its patients with ads based on their patient status and health conditions. In return for Defendant's transaction, Facebook and google were granted access to formerly secret information—that Defendant held out as protected—that is used by Facebook and Google to offer ultra-specific advertising services.

338. As a result of Defendant's actions, Plaintiff and California Subclass Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

339. Because Defendant intentionally and willfully incorporated the Meta Pixel into its Website and encouraged patients to use its Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

340. Plaintiff and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the same or similar conduct in the future.

341. Plaintiff and California Subclass Members seek appropriate

relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and California Subclass Members' privacy.

342. Plaintiff and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

343. Plaintiff JOHN DOE 1 seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

**COUNT V**

**COMMON LAW INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

344. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themselves and the proposed Class.

345. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communication platforms and services therein.

346. Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

347. Defendant's disclosure of the substance and nature of those communications to third parties such as Facebook and Google without the knowledge and consent of Plaintiffs and Class Members is an intentional

intrusion on Plaintiffs' and Class Members' solitude or seclusion.

348. Plaintiffs and Class Members had a reasonable expectation of privacy because Defendant's Website Privacy Notice states that they can expect such privacy. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of highly sensitive private medical information coupled with individually identifying information is highly offensive to the reasonable person.

349. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

350. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

351. Plaintiffs and Class Members seek appropriate relief for these injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiffs' and Class Members' privacy.

352. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT VI

## BREACH OF IMPLIED CONTRACT
***(On behalf of Plaintiffs & the Nationwide Class)***

353. Plaintiffs repeat the allegations contained in the paragraphs

above as if fully set forth herein and bring this count on behalf of themselves and the proposed Class.

354. Banyan solicited and invited Plaintiffs and Class Members to provide their Private Information through Banyan's Website as part of its regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

355. Defendant required Plaintiffs and Class Members to provide their Private Information, including medical conditions and treatments sought, computer IP addresses, appointment information, medical insurance information, medical provider information, medical histories, and other content submitted on Defendant's Website as a condition of their receiving healthcare services.

356. As a condition of utilizing Banyan's Website and receiving services from Defendant, Plaintiffs and Class Members provided their Private Information and compensation for their medical care. In so doing, Plaintiffs and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Practices and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised or stolen.

357. Implicit in the agreement between Defendant and its patients was the obligation that both parties would maintain the Private Information confidentially and securely.

358. Defendant had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class Members in its possession was used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendant.

359. Defendant had an implied duty to protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses.

360. Additionally, Defendant implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

361. Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

362. Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not.

363. Plaintiffs and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information for uses other than medical treatment, billing, and benefits from Defendant.

364. Consumers of medical services value their privacy and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected, nor would Plaintiffs and Class Members have entrusted their Private Information to Defendant in the absence of Defendant's implied promise to monitor its Website, computer systems, and networks to ensure that reasonable data security measures were adopted and maintained.

365. Defendant breached the implied contracts with Plaintiffs and

Class Members by disclosing Plaintiffs' and Class Members' Private Information to unauthorized third parties, failing to properly safeguard and protect Plaintiffs' and Class Members' Private Information; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contract between Plaintiffs, Class Members, and Defendant.

366. Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class Members to provide their Private Information in exchange for medical treatment and benefits.

367. As a result of Defendant's failure to fulfill the promises in these implied contracts, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of diminished value.

368. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, the loss of control of their Private Information, disruption of their medical care and treatment, and the loss of the benefit of the bargain they had struck with Defendant.

369. As a direct and proximate result of Banyan's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT VII

### VIOLATION OF THE UNFAIR COMPETITION LAW ("UCL") CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et seq*. - Unlawful Prong

**(*On behalf of Plaintiff JOHN DOE 1 & the California Subclass*)**

370. Plaintiff JOHN DOE 1 repeats the allegations contained in the

paragraphs above as if fully set forth herein and brings this count on behalf of himself and the proposed California Subclass.

371. Defendant's conduct as alleged herein was unfair within the meaning of the UCL. The unfair prong of the UCL prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

372. Banyan's conduct, as alleged herein, was also fraudulent within the meaning of the UCL. Defendant made deceptive misrepresentations and omitted known material facts in connection with the solicitation, interception, disclosure, and use of Plaintiff's and California Subclass Members' Private Information. Defendant actively concealed and continued to assert misleading statements regarding its protection and limitation on the use of the Private Information. Meanwhile, Defendant was collecting and sharing Plaintiff's and California Subclass Members' Private Information without their authorization or knowledge to profit off of the information, and deliver targeted advertisements to Plaintiff and California Subclass Members, among other unlawful purposes.

373. Defendant's conduct, as alleged herein, was unlawful within the meaning of the UCL because it violated regulations and laws as discussed herein, including but not limited to HIPAA, Part 2, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*.

374. Had Plaintiff and California Subclass Members known Defendant would disclose and misuse their Private Information in contravention of Defendant's representations, they would never have used Banyan's Website and would not have shared their Private Information.

375. Defendant's unlawful actions in violation of the UCL have

caused and are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

376. As a direct and proximate result of Defendant's misconduct, Plaintiff and California Subclass Members had their private communications containing information related to their sensitive and confidential Private Information intercepted, disclosed, and used by third parties, including but not limited to Facebook.

377. As a result of Defendant's unlawful conduct, Plaintiff JOHN DOE 1 and California Subclass Class Members suffered an injury, including violation to their rights of privacy, loss of value and privacy of their Private Information, loss of control over their sensitive personal information, and suffered embarrassment and emotional distress as a result of this unauthorized sharing of information.

## COUNT VIII

### UNJUST ENRICHMENT
**(*On behalf of Plaintiffs & the Nationwide Class*)**

378. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count on behalf of themselves and the proposed Class.

379. This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

380. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and

Class Members conferred a benefit on Defendant in the form of monetary compensation.

381. That is, in exchange for disclosing the PII and PHI of its patients, Defendant is compensated by Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing. For example, by utilizing the Meta Pixel, the cost of advertising and retargeting on Facebook was reduced, thereby benefitting Defendant.

382. Plaintiffs and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties such as Facebook and Google.

383. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

384. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

385. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

386. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and

unconscionable methods, acts, and trade practices alleged in this Complaint.

387. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds they received as a result of its conduct alleged herein.

**COUNT IX**

**VIOLATION OF FLORIDA SECURITY OF COMMUNICATIONS ACT (FCSA) (Title XLVII, Section 934.01) (*On behalf of Plaintiff JOHN DOE 2 and Florida Subclass*)**

388. Plaintiff JOHN DOE 2 herein repeats, realleges, and fully incorporates all allegations in all preceding paragraphs.

389. Where there is a reasonable expectation of privacy, absent the consent of all parties, the FSCA prohibits, among other things, the intentional interception or procurement of another person to intercept any wire, oral, or electronic communication. Fla. Stat. §§934.03(1), 934.03(2)(d)

390. Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, electronic or oral communication in violation of the FSCA is subject to a civil action for, among other things: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10.

391. Under the FSCA, "wire communication" means "any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception including the use of such connection in a switching station furnished or operated by any person engaged in providing or operating such facilities for the transmission of intrastate, interstate, or foreign communications or

communications affecting intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(1).

392. Under the FSCA, "intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

393. Under the FSCA, "contents" in the context of "any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7).

394. Under the FSCA, "person" is defined as, inter alia, "any individual, partnership, association, joint stock company, trust, or corporation." Fla. Stat. § 934.02(5).

395. With some exclusions that do not impact the Florida Plaintiff's claims, under the FSCA, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system that affects intrastate, interstate, or foreign commerce . . ." Fla. Stat. 934.02(12).

396. The FSCA prohibits: (1) the interception or procurement of another to intercept any wire, oral or electronic communication; (2) the intentional disclosure of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication; and (3) the intentional use of the contents of any wire, oral or electronic communication that the discloser knew or should have known was obtained through the interception of a wire, oral or electronic communication. Fla.

Stat. 934.03(1).

397. Any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, a wire, oral or electronic communication in violation of the FSCA is subject to a civil action for: (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. Fla. Stat. 934.10.

398. At all relevant times, Defendant procured Facebook and Google to contemporaneously track and intercept Plaintiff JOHN DOE 2's and Florida Subclass Members' internet communications—communications include disclosure of diagnosis, treatment, patient status, or management of medical conditions—while navigating the Website.

399. Defendant procured Facebook and Google to contemporaneously intercept these communications without authorization and consent from Plaintiff JOHN DOE 2 and Florida Subclass Members.

400. Defendant, when procuring Facebook and Google to intercept Plaintiff JOHN DOE 2's and Florida Subclass Members' communications, intended Facebook to contemporaneously learn the meaning of the content of Plaintiff JOHN DOE 2's and Florida Subclass Members' communications with Defendant.

401. Plaintiff JOHN DOE 2 and Florida Subclass Members had a justified and reasonable expectation under the circumstances that their electronic communications would not be intercepted.

402. Plaintiff JOHN DOE 2 and Florida Subclass Members were not aware that their electronic communications were being intercepted by Facebook and did not consent to the interception.

403. In connection with procuring Facebook's and Google's contemporaneous interception of Plaintiff JOHN DOE 2's and Florida Subclass Members' communications with Banyan, Defendant embedded the Meta Pixel and Google tracking codes on the Website.

404. The Meta Pixel and Google tracking codes constitute an electronic or other device through which the contents of a wire, oral and electronic communication can be acquired, including the contents of Plaintiff JOHN DOE 2's and Florida Subclass Members' communications with Banyan via the Website.

405. Defendant's disclosures of Plaintiff's and Florida Subclass Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

406. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

407. Banyan willfully, knowingly, intentionally, and voluntarily engaged in the aforementioned acts when it incorporated the Meta Pixel and Google tracking codes on its Website, with knowledge of the tracking codes' purpose and functionality, and further utilized the benefits that the Pixel and Google tracking codes provide website owners to the detriment of Plaintiff JOHN DOE 2 and the Florida Subclass Members.

408. Plaintiff JOHN DOE 2 and the Florida Subclass Members could not have avoided the harms described herein through the exercise of ordinary diligence.

409. As a result of Banyan's actions, Plaintiff JOHN DOE 2 and Florida Subclass Members have suffered harm and injury.

410. Banyan's unlawful conduct is ongoing. Thus, injunctive and

declaratory relief is necessary and appropriate to prevent further violations.

411. Plaintiff JOHN DOE 2 and Florida Subclass Members have been damaged as a direct and proximate result of the Banyan's invasion of their privacy and are entitled to just compensation, including monetary damages.

412. Plaintiff JOHN DOE 2 and the Florida Subclass Members seek appropriate relief for these injuries, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests as a result of the Banyan's violation of the Florida Security of Communications Act.

413. Plaintiff JOHN DOE 2 and Florida Subclass Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

**COUNT X**

**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, Fla. Stat. §§ 501.201, *et seq*. ("FDUTPA")**
**(*On behalf of Plaintiff JOHN DOE 2 & the Florida Subclass*)**

414. Plaintiff JOHN DOE 2 herein repeats, realleges, and fully incorporates all allegations in all preceding paragraphs.

415. Florida Statutes Section 501.204 provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."

416. An act or practice is "deceptive" if it is likely to mislead a person, acting reasonably in the circumstances, to the person's detriment.

417. An act or practice is "unfair" if it "offends established public policy" and is "immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). "[A]n unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by countervailing benefits to the consumer or to competition." *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017).

418. FDUTPA is, "a consumer protection law intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." *Tuckish v. Pompano Motor Co.*, 337 F. Supp. 2d 1313, 1319 (S.D. Fla. 2004); FLA. STAT. § 501.202. In the interests of consumer protection, FDUTPA should be "liberally construed." *Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

419. Plaintiff JOHN DOE 2 and the Florida Subclass Members are "consumers" and "interested persons" as defined in Fla. Stat. 501.203(6)-(7).

420. Banyan engaged in unfair business practices by disclosing Plaintiff JOHN DOE 2's and Florida Subclass Members' Private Information to unrelated third parties, such as Facebook and Google, without prior consent despite its promises to keep such information confidential.

421. The unfair business practices by Banyan included widespread violations of Plaintiff JOHN DOE 2's and Florida Subclass Members' rights to privacy, including Banyan's failure to inform the public that using the Website would result in disclosing very private information to a third party.

422. Further, Banyan failed to issue a notice to Plaintiff JOHN DOE

2 and Florida Subclass Members' that their Private Information was impermissibly being disclosed to an unauthorized third party. In fact, the Defendant ***never*** disclosed to Plaintiff JOHN DOE 2 or Florida Subclass Members that they shared their sensitive and confidential communications and Private Information with Facebook, Google and likely other third parties.

423. Plaintiff JOHN DOE 2 and the Florida Subclass Members reasonably relied upon the representations the Banyan made in its Privacy Policy, including those representations concerning the confidentiality of patient information.

424. Defendant was in sole possession of and had a duty to disclose the material information that Plaintiff JOHN DOE 2's and Florida Subclass Members' Private Information was being shared with a third party.

425. Had Banyan disclosed that it shared Private Information with third parties, Plaintiff JOHN DOE 2 and the Florida Subclass would not have used their services at the level that they did.

426. As a direct and proximate cause of the Banyan's actions, Plaintiff JOHN DOE 2 and Florida Subclass Members suffered damage in that the information they intended to remain private is no longer so and their Private Information was disclosed to, tracked, and intercepted by the third-party Internet tracking companies without their knowledge or consent.

427. The harm caused by Banyan's conduct outweighs any potential benefits attributable to such conduct and there were reasonably available alternatives to further Defendant's legitimate business interests other than the wrongful conduct described herein.

428. Defendant knew or should have known of its deceptive, unfair, and unlawful conduct of disclosing Plaintiff JOHN DOE 2's and Florida

Subclass Members' Private Information to unauthorized third parties.

429. Defendant has exclusive knowledge about the integrity of their representations to keep users' information confidential and yet the Defendant failed to maintain Plaintiff JOHN DOE 2's and Florida Subclass Members' privacy, and protect their Private Information from disclosure to third parties, including Facebook and Google.

430. All of the conduct alleged herein occurs and continues to occur in Defendant's businesses and is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

431. Pursuant to Florida Statutes Section 501.211(2), Plaintiff JOHN DOE 2 and the Florida Subclass seek actual damages, plus attorneys' fees and costs.

432. Pursuant to Florida Statutes Section 501.211(1), Plaintiff JOHN DOE 2 and the Florida Subclass seek declaratory judgment that the above-described wrongful acts violate the FDUTPA.

433. Plaintiff JOHN DOE 2 and the Florida Subclass also seek injunctive relief in the form of an order against Banyan to prevent it from sharing Plaintiff JOHN DOE 2's and the Florida Subclass Members' Private Information among themselves and other third parties.

## RELIEF REQUESTED

434. Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that the Court grant the following relief:

a. Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

b. A declaratory judgment that Defendant violated: (1) the California Invasion of Privacy

Act; (2) the California Confidentiality of Medical Information Act; (3) Florida Security of Communications Act; (4) Florida Deceptive and Unfair Trade Practices Act; and (5) Plaintiffs' and Class Members' privacy rights as provided at common law and pursuant to the California Constitution;

c. An order enjoining Defendant from engaging in the unlawful practices and illegal acts described herein; and

d. An order awarding Plaintiffs and the Class: (1) actual or statutory damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable attorney fees and expenses and costs of suit pursuant to California Code of Civil Procedure § 1021.5 or other applicable law; and (6) Such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all claims asserted herein and so triable.

DATED: October 11, 2024

*/s/ Matthew Langley*
Matthew Langley, California Bar No. 342846
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue

Chicago, Illinois 60614
t: 312-576-3024
matt@almeidalawgroup.com

Daniel Srourian, California Bar No. 285678
**SROURIAN LAW FIRM, P.C.**
3435 Wilshire Blvd. Suite 1710
Los Angeles, CA 90010
daniel@slfla.com

*Attorneys for Plaintiffs & the Classes*